UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

HOCKEY WESTERN NEW YORK, LLC
and BUFFALO BILLS, LLC,

                Plaintiffs,

v.

DCR STRATEGIES, INC.,

                Defendants.

COMPLAINT WITH
JURY DEMAND

Index No. _____

---

Plaintiffs Hockey Western New York, LLC and Buffalo Bills, LLC, by and through their attorneys, Lipsitz Green Scime Cambria LLP, as and for their Complaint against Defendant DCR Strategies, Inc. herein allege as follows:

**PARTIES**

1. At all times relevant hereto, Hockey Western New York, LLC was and is a New York limited liability company with a principal business address located at Seymour H. Knox, III Plaza, Buffalo, New York 14203, and is a member of the National Hockey League operating the professional hockey team known as the Buffalo Sabres (hereinafter the "Sabres" or "Buffalo Sabres Hockey Club").

2. At all times relevant hereto, Buffalo Bills, LLC, was and is a Delaware limited liability company authorized to business in the State of New York, with a principal business address located at One Bills Drive, Orchard Park, NY 14127 (the "Bills" or "Buffalo Bills Football Club"). Buffalo Bills Football Club is a member of the National Football League operating the professional football team known as the Buffalo Bills.

3. Upon information and belief, Defendant DCR Strategies, Inc. ("DCR") was and is a Canadian corporation not authorized to do business in the State of New York, with a principal business address located at 2680 Skymark Avenue, Unit 420, Mississauga, Ontario L4W 5L6.

## JURISDICTION AND VENUE

4. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper in this action pursuant to 28 U.S.C. § 1391(b)(1) because DCR has consented to jurisdiction and venue in Erie County pursuant to its respective contracts with each plaintiff, and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

6. Upon information and belief, DCR promotes and operates a customized pre-paid card program under the service mark "TruCa$h", which enables card holders to access funds to purchase products and services pursuant to company-provided benefit programs.

## SABREBUCKS PROGRAM

7. On or about September 23, 2014, the Sabres entered into a written "Pre-Paid Card Agreement" with DCR whereby DCR agreed to administer a customized pre-paid card loyalty program to be offered to the Sabres' fan base termed "Sabrebucks". A true and correct copy of the Sabres Agreement is attached hereto as **Exhibit A** and incorporated herein as if fully set forth at length.

8. Two separate classes of cards were to be part of the Sabrebucks program.

9. The first card was named the "Sabrebucks Member Club card" and defined in the Sabres Agreement as a "Trucash card that is sold by the Buffalo Sabres Hockey Club to any 3rd party and is initially loaded with his/her own cash or credit card. Card is also reloadable by cardholder with his/her own cash or credit/debit card."

10. The second card was named the "Sabrebucks Season Ticketholder card" and defined in the Sabres Agreement as a "Trucash card, provided to Buffalo Sabres Season ticketholder [sic] free of charge, which is initially loaded with money provided by the Buffalo Sabres Hockey Club and is reloadable by cardholder with his/her own cash or credit/debit card."

11. The Sabres Agreement defines "Truca$h Card" as a "prepaid Sabrebucks Season Ticketholder card or Sabrebucks Member Club card which enables Cardholders to carry out certain business purchases at First Niagara Center and other limited locations, all of which are to be selected by the Buffalo Sabres Hockey Club."

12. Pursuant to the Sabres Agreement, the Buffalo Sabres Hockey Club was required to fund the Sabrebucks program by depositing funds into a "Trust Account".

13. Pursuant to paragraph 3.12 of the Sabres Agreement, the Trust Account was to be established at Community Federal Savings Bank ("CFSB"), which was represented by DCR to be FDIC insured and "that the monies that are to be placed into the bank are fully insured, without limit." DCR was further required to "provide satisfactory documentation, in the form of a letter agreement…" that CFSB would regulate distribution of the funds within the Trust Account in accordance with the terms of the Sabres Agreement.

14. Prepaid "Truca$h" cards would thereafter be purchased by the Buffalo Sabres Hockey Club for distribution to Sabrebucks program participants - defined as "Cardholders" and/or "Program Members" in the Sabres Agreement.

3

15. Paragraph 3.3. of the Sabres Agreement, DCR expressly agreed to:

> hold all funds transferred by **BUFFALO SABRES HOCKEY CLUB** into the Trust Account in trust for the benefit of **BUFFALO SABRES HOCKEY CLUB** to be applied as provided herein, until such time as the funds have been transferred to Cardholder's accounts pursuant to the terms and conditions of this Agreement. For greater clarity, it is acknowledged by DCR that all funds deposited by **BUFFALO SABRES HOCKEY CLUB** shall remain the property of **BUFFALO SABRES HOCKEY CLUB** until such times as those funds are loaded onto cardholder's cards, or returned to **BUFFALO SABRES HOCKEY CLUB** and/or Program Members as directed by the **BUFFALO SABRES HOCKEY CLUB**. (Emphasis in original)

16. Paragraph 3.2 of the Sabres Agreement provides that, at its sole cost and expense, DCR would provide monthly reporting to the Sabres, and "as otherwise may be reasonably requested" by the Sabres.

17. Paragraph 9.7 of the Sabres Agreement, provides that in accordance with Paragraph 3.3, "any monies remaining in the Trust Account at termination of the Agreement is property of the Buffalo Sabres Hockey Club and/or Program Member and DCR agrees to provide any release/documentation necessary to enable Buffalo Sabres Hockey Club to remove said property from the Trust Account."

18. Paragraph 10.6 of the Sabres Agreement provides that the agreement could not be amended without "the express written consent of all of the parties to the Agreement".

19. Thus at the time the Sabres Agreement was executed, the Sabres understood and relied upon the representations of DCR that DCR would be obligated to hold the Sabres' deposited funds in trust for its benefit in a trust account established at a U.S. based, FDIC insured bank, and that the bank would agree to be bound to the terms of the Sabres Agreement which would therefore require the written consent of the Sabres to any transfer of funds not in

accordance with said Agreement, including a change from CFSB to any other financial institution.

20.     The initial term of the Sabres Agreement was two years, subject to discretionary renewal for additional one year periods, and terminated on September 23, 2016.

### BILLS BUCKS PROGRAM

21.     On or about June 4, 2015, the Bills entered into a written prepaid card agreement with DCR for the purpose of having DCR operate a customized pre-paid card loyalty program to be offered to the Bills' fan base termed the "Bills Bucks" program (the "Bills Agreement"). A true and correct copy of the Bills Agreement is attached hereto as **Exhibit B**, and incorporated herein by reference as though fully set forth at length.

22.     Two separate classes of cards were to be part of the Bills Bucks program.

23.     The first card was named the "Bills Bucks card" defined in the Bills Agreement as a "Truca$h card that is sold by the Buffalo Bills Football Club to any 3rd party and is initially loaded with his/her own cash or credit card. Card is also reloadable by cardholder with his/her own cash or credit/debit card."

24.     The second card was named the "Bills Bucks Season Member card" and defined in the Bills Agreement as a "Truca$h card, provided to Buffalo Bills Season ticketholder [sic] free of charge, which is initially loaded with money provided by the Buffalo Bills Football Club and is reloadable by cardholder with his/her own cash or credit/debit card."

25.     The Bills Agreement defines "Truca$h Card" as a prepaid Bills Bucks Season Member card or Bills Bucks card which enables Cardholders to carry out certain business purchases at Ralph Wilson Stadium and other limited locations, all of which are to be selected by the Buffalo Bills Football Club."

26. Pursuant to paragraph 3.10 of the Bills Agreement, the Trust Account was to be established at Consumers Bank, which was represented by DCR to be FDIC insured and "that the monies that are to be placed into the bank are fully insured, without limit." DCR was further required to "provide satisfactory documentation, in the form of a letter agreement…" that Consumers Bank would regulate distribution of the funds within the Trust Account in accordance with the Terms of the Bills Agreement.

27. Prepaid "TruCa$h" cards would thereafter be purchased by the Buffalo Bills Football Club for distribution to Bills Bucks program participants - defined as "Cardholders" and/or "Program Members" in the Bills Agreement.

28. Paragraph 3.3. of the Bills Agreement, DCR expressly agreed to:

> hold all funds transferred by BUFFALO BILLS FOOTBALL CLUB into the Trust Account in trust for the benefit of BUFFALO BILLS FOOTBALL CLUB to be applied as provided herein, until such time as the funds have been transferred to Cardholder's accounts pursuant to the terms and conditions of this Agreement. For greater clarity, it is acknowledged by DCR that all funds deposited by BUFFALO BILLS FOOTBALL CLUB shall remain the property of BUFFALO BILLS FOOTBALL CLUB until such times as those funds are loaded onto cardholder's cards, or returned to BUFFALO BILLS FOOTBALL CLUB and/or Program Members as directed by the BUFFALO BILLS FOOTBALL CLUB.

29. Paragraph 3.2 of the Bills Agreement provides that, at its sole cost and expense, DCR would provide monthly reporting to the Bills, and "as otherwise may be reasonably requested" by the Bills.

30. Paragraph 9.7 of the Bills Agreement, provides that in accordance with Paragraph 3.3, "any monies remaining in the Trust Account at termination of the Agreement is property of the Buffalo Bills Football Club and/or Program Member and DCR agrees to provide any

release/documentation necessary to enable Buffalo Bills Football Club to remove said property from the Trust Account."

31. Paragraph 10.6 of the Bills Agreement provides that the agreement could not be amended without "the express written consent of all of the parties to the Agreement".

32. Thus at the time the Bills Agreement was executed, the Bills understood and relied upon the representations of DCR that DCR would be obligated to hold the Bills' deposited funds in trust for its benefit in a trust account established at a U.S. based, FDIC insured bank, and that the bank would agree to be bound to the terms of the Bills Agreement which would therefore require the written consent of the Bills to any transfer of funds not in accordance with said Agreement, including a change from Consumers Bank to any other financial institution.

33. The initial term of the Bills Agreement was two years, subject to discretionary renewal for additional one year periods, and terminated on June 4, 2017.

## AS AND FOR A FIRST CLAIM FOR RELIEF

(Breach of Contract)

34. Plaintiff Buffalo Sabres Hockey Club repeats and realleges paragraphs 1 through 20, above, with the same force and effect as if fully set forth herein at length.

35. Upon information and belief, the Trust Account was moved from CFSB to the Bank of Montreal, which upon information and belief, is not FDIC insured and not based in the U.S.

36. An amendment was never signed by the Sabres authorizing the transfer of the trust funds held at CFSB to the Bank of Montreal in violation of Paragraph 10.6 of the Agreement, and DCR's obligation in accordance with paragraph 3.3 of the Agreement to hold said funds in trust for the benefit of the Sabres at CFSB, an FDIC insured financial institution.

37. DCR has not provided the Sabres with any letter agreement demonstrating that the Bank of Montreal is fully insuring the funds of the Sabres deposited into the Trust Account, or that it has agreed to regulate the distribution of funds from the Trust Account in accordance with the Sabres Agreement.

38. In addition, despite due demand, DCR has failed and refused to provide an accurate accounting and report of the administration of the funds deposited by the Sabres into the Trust Account.

39. DCR has attempted to impose fees on the remaining balance held in trust that are not authorized under the terms and conditions of the Sabres Agreement.

40. DCR has failed and refused to return the remaining balance of funds deposited by the Sabres into the Trust Account in violation of its obligations under Paragraphs 3.3 and 9.7 of the Sabres Agreement.

41. As of December 10, 2017, there was purportedly $392,084.02 remaining in the Sabres' Trust Account. Upon information and belief, this amount is less than the amount otherwise owed to the Sabres by reason of the imposition of unauthorized fees by DCR.

42. Said money has not been returned despite due demand by the Sabres, nor has DCR provided the Sabres with an accounting of said funds since December 2017.

43. By reason of the foregoing, Defendant DCR is in breach of the Sabres Agreement, and the Buffalo Sabres Hockey Club has been damaged thereby in an amount to be determined at trial but believed to be at least $392,084.02, together with lawful interest thereon.

## AS AND FOR A SECOND CLAIM FOR RELEIF

(Conversion)

44. Plaintiff Buffalo Sabres Hockey Club repeats and realleges paragraphs 1 through 20 and 34 through 43, above, with the same force and effect as if fully set forth herein at length.

45. Buffalo Sabres Hockey Club is the owner of all funds held in the Trust Account.

46. Despite due demand, DCR has failed to return all funds controlled by it from the Trust Account to the Sabres, and thereby interfered with the Sabres' exclusive right to possession of same.

47. The aforesaid interference to the Sabres' right to possession of said funds is willful.

48. By reason of the foregoing, DCR has converted the property of the Sabres entitling Plaintiff Buffalo Sabres Hockey Club to damages in an amount to be determined at trial, but at least $392,084.02, together with lawful interest thereon and an award of punitive damages.

## AS AND FOR A THIRD CLAIM FOR RELIEF

(Unjust Enrichment)

49. Plaintiff Buffalo Sabres Hockey Club repeats and realleges paragraphs 1 through 20 and 34 through 48, above, with the same force and effect as if fully set forth herein at length.

50. Buffalo Sabres Hockey Club is the owner of all funds held in the Trust Account administered by DCR for the Sabres benefit.

51. Upon information and belief, DCR has diverted the funds deposited by the Sabres into the Trust Account for its own benefit at the expense of the Sabres.

52. Despite due demand, DCR has failed and refused to refund the funds of the Buffalo Sabres Hockey Club.

53. Equity and good conscience require restitution of the aforesaid funds to the Buffalo Sabres Hockey club in an amount to be determined at trial, but at least $392,084.02, together with lawful interest thereon.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

(Breach of Contract)

54. Plaintiff Buffalo Bills Football Club repeats and realleges paragraphs 1 through 6 and 21 through 33, above, with the same force and effect as if fully set forth herein at length.

55. Upon information and belief, the Trust Account was moved from Consumers Bank to the Bank of Montreal, which upon information and belief, is not FDIC insured and not based in the U.S.

56. An amendment was never signed by the Bills authorizing the transfer of the trust funds held at Consumers Bank to the Bank of Montreal in violation of Paragraph 10.6 of the Agreement, and DCR's obligation in accordance with paragraph 3.3 of the Agreement to hold said funds in trust for the benefit of the Bills at Consumers Bank, an FDIC insured financial institution.

57. DCR has not provided the Bills with any letter agreement demonstrating that the Bank of Montreal is fully insuring the funds of the Bills deposited into the Trust Account, or that it has agreed to regulate the distribution of funds from the Trust Account in accordance with the Bills Agreement.

58. In addition, despite due demand, DCR has failed and refused to provide an accurate accounting and report of the administration of the funds deposited by the Bills into the Trust Account.

59. DCR has attempted to impose fees on the remaining balance held in trust that are not authorized under the terms and conditions of the Bills Agreement.

60. DCR has failed and refused to return the remaining balance of funds deposited by the Bills into the Trust Account in violation of its obligations under Paragraphs 3.3 and 9.7 of the Bills Agreement.

61. As of October 14, 2018, there was purportedly $99,009.76 remaining in the Bills' Trust Account. Upon information and belief, this amount is less than the amount otherwise owed to the Bills by reason of the imposition of unauthorized fees by DCR.

62. Said money has not been returned despite due demand by the Bills, with DCR falsely claiming that some, or all, of that money is for fees and other costs.

63. By reason of the foregoing, the Buffalo Bills Football Club has been damaged in an amount to be determined at trial but believed to be at least $99,009.76, together with lawful interest thereon.

## AS AND FOR A FIFTH CLAIM FOR RELEIF
(Conversion)

64. Plaintiff Buffalo Bills Football Club repeats and realleges paragraphs 1 through 6, 21 through 33, and 54 through 63, above, with the same force and effect as if fully set forth herein at length.

65. Buffalo Bills Football Club is the owner of all funds held in the Trust Account.

66. Despite due demand, DCR has failed to return all funds controlled by it from the Trust Account to the Buffalo Bills, and thereby interfered in the Bills' exclusive right to possession in same.

67. The aforesaid interference to the Bills' right to possession of said funds is willful.

68. By reason of the foregoing, DCR has converted the property of the Bills entitling Plaintiff Buffalo Bills Football Club to damages in an amount to be determined at trial, but at least $99,009.76, together with lawful interest thereon and an award of punitive damages.

## AS AND FOR A SIXTH CAUSE FOR RELIEF
### (Unjust Enrichment)

69. Plaintiff Buffalo Bills Football Club repeats and realleges paragraphs 1 through 6, 21 through 33, and 54 through 68, above, with the same force and effect as if fully set forth herein at length..

70. Buffalo Bills Football Club is the owner of all funds held in the Trust Account administered by DCR for the Bills' benefit.

71. Upon information and belief, DCR has diverted the funds deposited by the Bills into the Trust Account for its own benefit at the expense of the Bills.

72. Despite due demand, DCR has failed and refused to refund the funds of the Buffalo Bills Football Club.

73. Equity and good conscience require restitution of the aforesaid funds to the Buffalo Bills Football club in an amount to be determined at trial, but at least $99,009.76, together with lawful interest thereon.

WHEREFORE, Plaintiffs Hockey Western New York, LLC and Buffalo Bills, LLC, each demand judgment as follows:

1. Judgment in favor of Plaintiff Hockey Western New York, LLC in an amount to be determined at trial, but at least $392,084.02, on the First, Second and Third Claims for Relief, together with lawful interest thereon and award of punitive damages on its Second Claim for Relief;

2. Judgment in favor of Plaintiff Buffalo Bills, LLC in an amount to be determined at trial, but at least $99,009.76 on the Fourth, Fifth and Sixth Claims for Relief, together with lawful interest thereon and award of punitive damages on its Fifth Claim for Relief;

3. Each Plaintiff's costs and disbursements incurred herein;

4. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action of all issues so triable.


Dated: December 4, 2018
       Buffalo, New York

                                        LIPSITZ GREEN SCIME CAMBRIA LLP

                                        By: _____
                                            Jeffrey F. Reina, Esq.
                                            *Attorneys for Plaintiffs*
                                            42 Delaware Avenue, Suite 120
                                            Buffalo, New York 14202
                                            (716) 849-1333 [Ext. 481]
                                            jreina@lglaw.com