# EXHIBIT A


TruCa$h

Prepaid Card Agreement 2014

**THIS AGREEMENT** made as of and effective from the 23 day of *September*, 2014 between:

**HOCKEY WESTERN NEW YORK LLC**, a company, located at 1 Seymour H. Knox III Plaza, in the City of Buffalo, New York, 14203 (hereinafter referred to as **"Buffalo Sabres Hockey Club"**), of the first part;
–and–
**DCR STRATEGIES INC.**, a corporation located at 2680 Skymark Ave Unit 420 in the City of Mississauga, ON, L4W 5L6 (hereinafter referred to as **"DCR"**) of the second part;

WHEREAS:

1) **BUFFALO SABRES HOCKEY CLUB** operates a professional hockey team in Buffalo, NY and desires to offer a pre-paid card, with limited and specific applications, to it's season ticketholders and others,

2) **DCR** promotes and operates a customized prepaid card program under the service mark "TruCa$h" which enables cardholders (hereinafter defined) to access funds in order to purchase products and services pursuant to company provided benefit programs (the **"Program"**),

3) **BUFFALO SABRES HOCKEY CLUB** and **DCR** have agreed to facilitate the participation of Program Members (hereinafter defined) in the Program, and

4) Both **BUFFALO SABRES HOCKEY CLUB** AND **DCR** acknowledge that the Program is NOT a credit, charge or travel/entertainment card

NOW WITNESS that in consideration of the mutual covenants and agreements hereinafter expressed, and other good and valuable consideration, receipt and sufficiency whereof is acknowledged by each of the parties, the parties agree as follows:

**1 – INTERPRETATION**

**1.1 Definitions**

Where used in this Agreement the following words and phrases shall have the meanings set forth below unless the context otherwise requires:

(a) **"Agreement"** means this Agreement and any instrument amending this Agreement and the schedules attached hereto as may be amended from time to time through mutual written agreement of the parties;

(b) **"Cardholder"** means an individual who is issued a TruCa$h Card (hereinafter defined) in order to participate in the Program by virtue of his or her enrollment in the Program.

(c) **"E-Wallet Functionality"** means a feature of the TruCa$h Card that allows a Cardholder to access account balances and transaction history via the internet;

(d) **"Issuer" means the Community Federal Savings Bank (CFSB), Member FDIC as the Discover Financial Services Network (DFSN) member and issuing financial institution**

(e) **"Sabrebucks Member Club card"** means a Trucash card that is sold by the Buffalo Sabres Hockey Club to any 3rd party and is initially loaded with his/her own cash or credit/debit card. Card is also reloadable by cardholder with his/her own cash or credit/debit card.

(f) **"Sabrebucks Season Ticketholder card"** means a Trucash card, provided to Buffalo Sabres Season ticketholder free of charge, which is initially loaded with money provided by the Buffalo Sabres Hockey Club and is reloadable by cardholder with his/her own cash or credit/debit card.

(g) **"TruCa$h Card"** means a prepaid Sabrebucks Season Ticketholder card or Sabrebucks

Member Club cardwhich enables Cardholders to carry outcertain business purchases at First Niagara Center and other limited locations, all of which are to be selected by the **BUFFALO SABRES HOCKEY CLUB.;**

(h) **"Trust Account"** means an account administered by the Issuer into which funds are deposited by **BUFFALO SABRES HOCKEY CLUB**and/or Program Members, and from which payments are distributed to certain business retailers or entities  and the parties to this Agreement, as the case may be, pursuant to the terms and conditions of this Agreement

(i) **"Program Member"** means acardholder who has entered into an agreement with **BUFFALO SABRES HOCKEY CLUB** and is, consequently, participating in the Program.


## 2 - COVENANTS OF BUFFALO SABRES HOCKEY CLUB

**BUFFALO SABRES HOCKEY CLUB** agrees as follows:

2.1 To purchase prepaid TruCa$h Cards for distribution to Cardholders in accordance with the prices and terms set forth in Schedule "A" attached hereto. Project timeline will be determined and accepted by both parties

2.2 To provide personal information ("Cardholder Information") relating to Cardholders in accordance with a form and manner provided by DCR, in an electronic format acceptable to DCR within reason.Such information will include First Name, Last Name and Address and will enable the reloading of the card associated with the member.  D.O.B of member shall be required at the time when additional funds are added by the cardholder.

a) As part of the Cardholder information, Buffalo Sabres Hockey Club agree to provide (i) the date that a Cardholder is authorized to utilize their Trucash card and; (ii) the total amount that the Cardholder is authorized to charge.

2.3 Ensure sufficient funds are maintained in the Trust Account to cover the use of the Trucash card by Program Member.  For each hockey season (September – May, or through end of playoffs), Buffalo Sabres Hockey Club agrees to maintain a deposit of $75,000 within the Trust Account. When the account is reduced below $40,000, or after each gameBuffalo Sabres Hockey Club agrees to replenish the Trust Account by the immediate wiring of monies into the Trust Account.  Both parties agree to monitor the activity of the Trust Account on at least a weekly basis.

a)       Buffalo Sabres hockey Club will have the option, to separate the Accounts used for Sabrebucks Seasonticketholders and the Sabrebucks Member Club cards, thereby utilizing two (2) separate accounts.  The deposit schedule for the Sabrebucks Season ticketholder Account would not change from above, whereas the deposit that would be required to be maintained for the Member Club Account, is to be mutually agreed upon, but in no event would be greater than $10,000.


## 3 - COVENANTS OF DCR STRATEGIES INC.

**DCR** agrees as follows:
3.1 To administer the Program, including, without limitation, the recording and completion of all transactions between Cardholders and merchants with which Cardholders transact pursuant to their participation in the Program.

3.2 To provide, at **DCR**'ssole cost and expense, reports on a monthly basis, and as otherwise may be reasonably requested by**BUFFALO SABRES HOCKEY CLUB,**in a form and manner predetermined and agreed upon and as specified by **BUFFALO SABRES HOCKEY CLUB,** acting reasonably,for the purposes of fulfilling its obligations hereunder, and at all times

3

subject to the provisions of 8.4 herein

3.3 To hold all funds transferred by **BUFFALO SABRES HOCKEY CLUB** to the Trust Account in trust for the benefit of **BUFFALO SABRES HOCKEY CLUB**, to be applied as provided herein, until such time as the funds have been transferred to Cardholders accounts pursuant to the terms and conditions of this Agreement. For greater clarity, it is acknowledged by DCR that all funds deposited by **BUFFALO SABRES HOCKEY CLUB** shall remain the property of **BUFFALO SABRES HOCKEY CLUB** until such times as those funds are loaded onto cardholder's cards, or returned to **BUFFALO SABRES HOCKEY CLUB** and/or Program Member, as directed by the BUFFALO SABRES HOCKEY CLUB.

3.4 To provide the framework/authorization that will allow the transfer of monies, previously provided by BUFFALO SABRES HOCKEY CLUB to issuer pursuant to 2.3 herein, between appropriate accounts within the Issuer in order to allow the loading of monies onto Trucash Cards which in turn allow the Cardholder to utilize their Trucash Cards.

3.5 To support E-Wallet Functionality to enable Cardholders to access their unique card accounts, and monitor their TruCa$h debit card Point of Sale detail and history.

3.7 To provide Cardholders with TruCa$h Card functionality that permits Cardholders to accessany and all of the funds that the Buffalo Sabres (or Cardholder) have authorized be available on the Trucash Card for Point-of-Sale systems' purchases while at HSBC Arena (or other authorized locations). Fees and the cost of any other services that may be provided to Cardholders from time to timein connection with their participation with the Program will be charged to the Cardholder at posted rates in effect under the terms of this Agreement at the time of the transaction.

3.9 To provide a call centre and a toll-free numberwith service coverage available toCardholders twenty four (24) hours a day seven (7) days a week.For the first several games of the preseason and regular season, DCR will have additional representatives available to discuss and remedy an issues or glitches that will arise with the program

3.10 Not to use any Cardholder Information and data provided by **BUFFALO SABRES HOCKEY CLUB** other than to promote Buffalo Sabres Programand that any advertising/promotion will be submitted to the Buffalo Sabres Hockey Club to review and written approval.

3.11 To ensure that the Issuer or any other parties with which DCR transacts business in order to carryout their duties under this Agreement, comply with all appropriate laws, rules and regulationsapplicable to that party's activities imposed by the applicable jurisdictions and regulatory bodies, as the case may be.

3.12 CFSB is FDIC insured and that the monies that are to be placed into the bank are fully insured, without limit. DCR to provide satisfactory documentation, in the form of a letter agreement, that CFSBwill regulate distribution of monies within the Trust Account in accordance with the Terms of this Agreement.

3.13 To provide software that will enable Cardholder to perform all the functions under this Agreement that is secure and will protect the cardholders' information from theft.

3.14 To provide a dedicated IT specialist and a program manager to be responsible for management of the BUFFALO SABRES HOCKEY CLUB program.

## 4 – CHARGES

4.1 **BUFFALO SABRES HOCKEY CLUB** shall pay to **DCR** the amounts on the dates indicated in Schedule "A" attached hereto for the initial supply of TruCa$h Cards, plus applicable taxes, shipping and handling costs.

4.2 The Cardholder shall be charged the fees indicated in Schedule "B" attached hereto for the

4

usages indicated thereon. Unless otherwise noted, the charged fees shall be automatically deducted from the Cardholder's account.

## 5—INTELLECTUAL PROPERTY

5.1   DCR hereby grants to **BUFFALO SABRES HOCKEY CLUB** a non-exclusive, revocable license to use the "TruCa$h" service mark and "TruCa$h" logos and otherwise make use of DCR's intellectual property and proprietary information solely for the purposes of carrying out **BUFFALO SABRES HOCKEY CLUB**'s obligations hereunder and according to the terms and conditions contained herein.

5.2   **BUFFALO SABRES HOCKEY CLUB** hereby grants to **DCR** the non-exclusive, revocable and limited license to use the Buffalo Sabres Hockey Club Marks (as provided for by the Buffalo Sabres Hockey Club) solely in connection with carrying out DCR's obligations hereunder and according to the terms and conditions contained herein, subject in each instance to the prior approval of Buffalo Sabres Hockey Club. Each and every proposed usage of the Marks (including all text and contextual material) hereunder must be approved in advance, in writing, by Buffalo Sabres Hockey Club, and DCR hereby agrees to provide Buffalo Sabres Hockey Club with copies of all proposed usages sufficiently in advance so that Buffalo Sabres Hockey Club may exercise its approval rights hereunder. Once approved, any departure from such approved use will require the prior written approval of Buffalo Sabres Hockey Club. This license is subject and subordinate to the constitution, by-laws, resolutions, rules and agreements of the NHL.

5.3   The term of this license shall be co-extensive with the term of this Agreement. This license is limited to DCR's use of the Marks as permitted herein, and without limiting the foregoing, does not grant the right to use any other trademark or indicia of the NHL or its member clubs, or the names, likeness, reputations, good will or any other aspect of the right to privacy, personality or publicity of any individual or group, including any individual or group of present or former NHL players.

5.4   DCR agrees that it shall not at any time file an application for trademark registration or otherwise attempt to obtain ownership of any name, design, logo or trademark or trade name which includes or is confusingly similar to the Marks or which makes reference to the Marks nor otherwise take any action that will directly or indirectly challenge or contest the ownership of, or adversely affect, the Marks or Buffalo Sabres Hockey Club's rights therein. DCR agrees that any and all uses of the Marks by it shall inure to the benefit of Buffalo Sabres Hockey Club.

5.5   In the event of a termination of this license, DCR agrees to refrain from any further use of the Marks. DCR agrees that the Marks possess a special, unique and extraordinary character which makes difficult the assessment of monetary damages sustained by unauthorized use. DCR recognizes that irreparable injury would be caused by unauthorized use and agrees that injunctive and other equitable relief would be appropriate in the event of a breach of this license, provided that such remedy shall not be exclusive of other legal remedies otherwise available to Buffalo Sabres Hockey Club.

5.6   The parties acknowledge and agree that all intellectual property belonging to **DCR**, including, but not limited to, logos and trademarks, data and software code or systems shall remain the exclusive property of **DCR**, and may not be used by **BUFFALO SABRES HOCKEY CLUB** without the expressed written consent of **DCR** if such use is not in furtherance of this Agreement as contemplated in section 5.1 above.

## 6 - INDEMNITIES

6.1   **DCR** hereby agrees to defend, indemnify and saves harmless **BUFFALO SABRES HOCKEY**

5

CLUB, its affiliates, officers, directors, employees and agentsfrom all claims, costs, damages and liability, including attorney fees, arising in any way out of the operation of the Program by DCR or the work of any third party,including but not limited to the Issuer, i.e. CFSB, network, i.e. Discover, processor, i.e. FIS, who is to perform a function to help satisfy DCR obligations under the terms of this Agreement, negligence by DCR, the improper use of the intellectual property of BUFFALO SABRES HOCKEY CLUB by DCR or the breach of this Agreement, including but not limited to, the representations and warranties set forth herein by DCR.

6.2   BUFFALO SABRES HOCKEY CLUB hereby indemnifies and saves harmless DCR, its affiliates, officers, directors, employees and agentsfrom all claims, costs, damages, and liability arising from the negligence of theBUFFALO SABRES HOCKEY CLUB,the improper use of the TruCa$h logos and trademarks and intellectual property ofDCR by BUFFALO SABRES HOCKEY CLUB or the breach of this Agreement by BUFFALO SABRES HOCKEY CLUB.

6.3   BUFFALO SABRES HOCKEY CLUB hereby indemnifies and saves harmless DCR for any loss, damage or injury arising in connection with a claim associated with the loss, theft or fraudulent use of any TruCa$h Card purchased by BUFFALO SABRES HOCKEY CLUB pursuant to this Agreement, and any liability arising in any way out of such losses, save and except in the event any such losses are as a result of the negligence, willful misconduct or breach of DCR'scovenants, representations or warranties under this Agreement by DCRor those for whom it is at law responsible, or if such losses were due to the acts or omissions of a third party, including but not limited to the Issuer,i.e.CFSB, network, i.e. Discover, processor, i.e. FIS,who is toperform a function in order to satisfy DCR obligations under the terms of this Agreement.

6.4   Unless otherwise directed by the Buffalo Sabres Hockey Club, DCRhereby acknowledges and agrees that all fees associated with the stored value or functions of the TruCa$h as set forth in Schedule "B" attached hereto shall be the sole responsibility of Cardholders and DCR hereby indemnifies and releases/saves harmless BUFFALO SABRES HOCKEY CLUB from and against any non-payment of such fees by Cardholders.

## 7 – CONFIDENTIAL INFORMATION

7.1   In connection with the business relationship contemplated by this Agreement, a party, its employees, officers, agents and/or advisorsmay receive ("Receiving Party")or have access to commercially valuable proprietary information of the other party ("Disclosing Party"), including information, regardless of form, relating to the business of the Disclosing Party that is not generally available to others, including without limitation and by way of example only, trade secrets, know-how, customer lists, marketing and business plans ("Confidential Information").   The Receiving Party acknowledges and agrees that any Confidential Information received or otherwise obtained from the Disclosing Party shall remain the sole and exclusive property of the Disclosing Party and may not be used, disseminated or disclosed to the extent reasonably commercially possible (both during the term of this agreement and subsequent to the termination thereof) and shall be held by the Receiving Party in confidenceexcept as may be necessary to perform the obligations required under this Agreement or as may be required by law.   Confidential Information does not include information that: (i) at the time of disclosure to the Receiving Party is in the public domain; (ii) after disclosure to the Receiving Party becomes generally available to third parties by publication or otherwise through no breach of this Agreement by the Receiving Party; (iii) was lawfully in the possession of the Receiving Party prior to disclosure, as evidence by the written records of the Receiving Party and which was not acquired, directly or indirectly, from the Disclosing Party in connection with the this Agreement; or (iv) becomes available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party if such source was not, to the knowledge of the Receiving Party, subject to any prohibition against transmitting the information to the Receiving Party and was not bound by a confidentiality agreement with the Disclosing Party.

6

7.2 Notwithstanding anything to the contrary contained herein, **DCR** acknowledges and agrees that it shall not allow any other **DCR**partner or other third party to have access to any information with respect to **BUFFALO SABRES HOCKEY CLUB** or **BUFFALO SABRES HOCKEY CLUB**'s customers. **DCR** will keep **BUFFALO SABRES HOCKEY CLUB**'s database information in strict confidence.

7.3 Nothing herein shall restrict **BUFFALO SABRES HOCKEY CLUB'S**use of any information contained in **BUFFALO SABRES HOCKEY CLUB**'srecords regarding **BUFFALO SABRES HOCKEY CLUB'S**customers or their transactions with **BUFFALO SABRES HOCKEY CLUB**.

## 8 – REPRESENTATIONS & WARRANTIES

Each party hereby represents and warrants to the other that:

8.1 It fully has the right, power and authority to enter into this Agreement and perform any acts as required under this Agreement and the performance of this Agreement by the party does not and will not breach any agreement entered into by the party or that otherwise binds such party.

8.2 It is the exclusive owner or authorized licensee of all rights, intellectual property, materials, software, technical know-how and informationsupplied, licensed or used by in connection with this Agreement.

8.3 It shall comply with all laws, rules and regulations applicable to that party's activities imposed by the applicable jurisdictions and regulatory bodies, as the case may be.

8.4 It shall maintain, use and disclose all personal information collected or otherwise obtained from Cardholders or any other individuals pursuant to performing its obligations under this Agreement in a manner that conforms with the requirements under the *Personal Information Protection and Electronic Documents Act* (Canada) and any and all other applicable privacy laws.

8.5 It shall at all times ensure that any services carried out by any third party (card issuer, ie. CFSB – any processors, i.e. FIS or network, i.e. Discover) in connection with a party's activities pursuant to this Agreement are carried out in accordance with the law, are of first class quality and of a substantially similar standard as can reasonably be expected from such services of a comparable class in the industry to which they belong. Notwithstanding the foregoing, no Confidential Information shall be provided to any third party unless the Receiving Party has informed the third party that the information is confidential and ensures that the recipient complies with Section 7.1 of this Agreement as if the recipient was also bound by it.

## 9 - TERM AND TERMINATION

9.1 This Agreement shall be effective on and from the date of execution hereof (the "**Effective Date**") and shall continuefor a term of two (2) years (the "**Term**"), unless earlier terminated pursuant to the terms hereunder.

9.2 This Agreement may be terminated by Buffalo Sabres Hockey Club, without cause or reason and without liability to the Buffalo Sabres Hockey Club, upon ninety (90) days prior written notice of Buffalo Sabres Hockey Club intention to terminate.

9.3 Unless the Buffalo Sabres Hockey Club provides written notice that they wish to exercise the option to renew this agreement for another 1 year period, at least 90 days from the end of the 2 year term (as noted above), this Agreement will expire at the end of the 2 year term. Such right to renew, by the Buffalo Sabres Hockey Club, will continue on annual basis and under the same terms each year thereafter.

9.4 Upon the occurrence of any of the following, either party shall have the right to terminate

this Agreement immediately upon notice to the other:

a) If either makes an assignment for the benefit of creditors, institutes or has instituted against it proceedings under any statute relating to insolvency or bankruptcy, or if a receiver or manager or person with like powers is appointed to take charge of its assets or undertaking;

b) If an order is made or resolution passed for the winding up or liquidation of either party; or

c) The entry by either party into an agreement for the sale in bulk of its assets or if there is a change in the effective voting control of either party.

9.5 Upon the occurrence of any of the following, the non defaulting party shall have the right to terminate this Agreement after notice in writing to the other of the particulars of such default if the other has not remedied such default during the specified notice period:

a) The failure to report in accordance with the terms of this Agreement and such default continues for seven (7) days after written notice has been given;

b) The failure to pay any sums due within the time required under this Agreement, and such default continues for ten (10) days after written notice has been given;

c) The failure to materially perform any of the other terms or conditions of this Agreement, including the failure of **DCR** systems and/or programs to work and where such default continues for thirty (30)* days after written notice has been given.

* For clarity and to ensure that all parties are on the same page, given that this program is going to be implemented during the National Hockey League season of the Buffalo Sabres and that throughout the season there are multiple games within a thirty (30) day time period, the parties recognize that the Program must function at a high level for each and every home game throughout the NHL season. Thus, it is agreed that if the Program significantly malfunctions for one Buffalo Sabres game, whether through fault of DCR or others (except the Buffalo Sabres Hockey Club in which case this provision will not apply), and DCR is not able to rectify the problem causing the malfunction prior to the next Buffalo Sabres home game, to the satisfaction of the Buffalo Sabres Hockey Club, the Buffalo Sabres Hockey Club will be allowed to terminate this Agreement immediately (without waiting a 30 day time period) upon written notice to DCR.

9.6 Upon termination by any party pursuant to any clause hereunder, the parties shall immediately stop operating the Program pursuant to this Agreement and shall forthwith cease all advertising and any use being made of the intellectual property of the other. Original versions of any and all Confidential Information, intellectual property or any other proprietary information or material shall be returned to the party to whom it belongs at the request of such party, within five (5) days of such request. Any copies of such information or other materials shall be destroyed or kept strictly confidential.

9.7 Pursuant to Paragraph 3.3 herein, any monies remaining in the Trust Account at termination of the Agreement is property of the Buffalo Sabres Hockey Club and/or Program Member and DCR agrees to provide any and all releases/documentation necessary to enable Buffalo Sabres Hockey Club to remove said property from the Trust Account.

## 10 - GENERAL CONTRACTUAL PROVISIONS

10.1 The parties expressly agree that nothing in this Agreement shall constitute any party as the agent, partner, or joint venture of the other and nothing in this Agreement shall grant any party the right to make representations or enter into any agreements on behalf of any other party. All parties agree to perform their covenants hereunder in a professional and ethical manner.

10.2 The parties agree that the laws of the State of New York shall govern this Agreement and that DCR agrees to Erie County as the jurisdiction for resolution of any legal proceedings

8

10.3 Should any dispute arise between the parties to this agreement that cannot be remedied satisfactorily by negotiation, the parties agree to submit the matter to arbitration to be governed in accordance with the American Arbitration Act and shall be binding. While **DCR** employs procedures to identify fraudulent transactions, subject at all times to section6.3 hereof,**DCR**assumes no responsibility or liability for failure to discover any fraud, theft or other dishonesty committed by any person not employed by **DCR**.

10.4 All notices, requests, demands or other communications required or permitted to be given by one party to any other party shall be given in writing by personal delivery, overnight courier or by facsimile transmission to such other party at the address stated below. All notices shall be deemed to have been received when delivered or transmitted,:

|  |  |
|---|---|
| **TO:   Hockey Western New York, LLC**<br>**First Niagara Center**<br>**1 Seymour H. Knox III Plaza**<br>**Buffalo, New York, 14203**<br>**Fax 716-855-4704** | **TO:   DCR STRATEGIES INC.**<br>**2680 Skymark Ave Suite 420**<br>**Mississauga, Ontario**<br>**L4W 5L6**<br>**Fax 905-212-9678** |

10.5 This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors.

10.6 The parties agree that this Agreement may not be amended without the express written consent of all of the parties to this Agreement.

10.7 All amounts indicated in this Agreement or any Schedule hereto shall be in U.S. Dollars.

10.8 Neither party may assign, delegate or otherwise transfer its rights or obligations under this Agreement, without the prior written consent of the other party; provided, however, that this Agreement and the rights thereunder may be assigned without such prior consent by Buffalo Sabres Hockey Club, to a corporate affiliate which shall assume all of its obligations hereunder or to any entity which purchases all or substantially all of the assets (or otherwise succeeds to the business) of Buffalo Sabres Hockey Club.

10.9 This Agreement is subject and subordinate in all respects to (a) all relevant present and future Federal, state and municipal laws, regulations, rules, orders, consent decrees and decisions, (b) the NHL constitution, NHL by-laws, and all rules, policies, board resolutions, decrees, regulations and agreements of the NHL (including, without limit, any national corporate marketing, licensing, sponsorship or similar agreements between the NHL (or an NHL affiliate) and third parties), all as the same may now exist or hereafter be amended or enacted or as they may be interpreted by the Commissioner ("NHL Rules and Agreements") and (c) the present and future constitution, by-laws, rules, regulations and agreements any other leagues having jurisdiction over the advertising and matters set forth herein. Without limiting the foregoing, if the benefits granted to DCR hereunder include advertising on the dasherboards or the ice surface of the Arena, then: (i) such advertising is subject to pre-emption in the event of a major television network contract to which the National Hockey League is a party or of an international event; and (ii) in the event that the Term exceeds one (1) year, this Agreement, notwithstanding anything to the contrary set forth herein, may be terminated at the end of any National Hockey League season by unilateral action of Buffalo Sabres Hockey Club or the Board of Governors of the National Hockey League.

10.10 This Agreement may be executed in one or more counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same agreement.  This Agreement may be executed by facsimile.

10.11 DCR, its subsidiaries and/or affiliates agrees to provide ten (10) percent of any net profits that are realized by DCR, its subsidiaries and/or affiliates, to the Buffalo Sabres Hockey Club, if a similar card program, is accepted and subsequently utilized by any other sports team throughout North America. DCR agrees to update the Buffalo Sabres Hockey Club on an annual basis on this issue.

9

10.12 Parties agree that the terms of this Agreement will be confidential and will not be disclosed to any third party, unless required by law, without the prior written approval of the other party.

10.13   If any one or more of the provisions of this Agreement or the application of any such provision to a specific situation will be held invalid or unenforceable, such provision will be modified to the minimum extent necessary to make it or its application valid, and the enforceability of all other provision of this Agreement and all other applications of such provision will not be affected thereby.

10.14   Unless specifically agreed to the contrary in writing, (i) the failure by either party at any time to require performance by the other of any provision of this Agreement will not affect such party's right thereafter to enforce such provision; (ii) no waiver by either party of any subsequent default; and (iii) no extension of time granted by either party for the performance of any obligation of the other will be deemed to be an extension of the time for performance of any other obligation hereunder.

10.15   A depiction of the Program and how it will function, as outlined herein, are set forth in Exhibit "A" attached hereto.

**IN WITNESS WHEREOF** this Agreement has been executed by the parties as of the date first written above.

**HOCKEY WESTERN NEW YORK LLC**          **DCR STRATEGIES INC.**

Per: _John R Sinclair_                   Per: _H Masse_
I have the authority to bind the Company       I have the authority to bind the Corporation

Name: JOHN R. SINCLAIR                   Name: Huguette MASSE
Title: V.P TICKETS AND SERVICE           Title: CEO

**SCHEDULE "A"**

**Locations**
Location information to be provided by **BUFFALO SABRES HOCKEY CLUB** and shall include operating name of location, contact person at the location, full address, telephone number and any other information required to run the Program.

**Initial Supply of Cards**

**BUFFALO SABRES HOCKEY CLUB** shall purchase the following:
   a) **Up to a maximum of 8,000 cards for Season Ticket Holders at a price of $3.50 per card per member per year with an expiration date of two(2) years**
   b) **Up to a maximum of 5,000 Member Club Card (White Card) at a price of $3.50 per card with an expiration date of two(2) year.**
**Card costs are** payable as follows:
Upon receipt of invoice

*\*Above card prices are exclusive of shipping and handling charges **and applicable taxes.***

**Price of card will include the following:**
   - design and printing of a customized four-color card. Front of the card will include customization for **BUFFALO SABRES HOCKEY CLUB** and back of the card will be printed as per DCR specification
   -
   - all loads onto cards

- all POS transactions
- design and printing of a customized carrier
- affixing card sticker to card
- encoding, embossing or thermal imaging

BUFFALO SABRES will offer a Luxury Suite to DCR at no charge for one game night that will include food and beverages (Alcoholic and non-Alcoholic) Date to be determined and approved by both parties.

**BUFFALO SABRES HOCKEY**
**CLUB Schedule "B"**
**Processing Service Fees**

| Fee Description | DCR Fees to Buffalo Sabres | Buffalo Sabres Fees to Cardholder |
| --- | --- | --- |
| Load Fee | included | nil |
| POS usage | included | nil |
| **Additional Cardholder Services are Optional** | | |
| POS declined transaction fee | included | included |
| Replacement Card | TBA | TBA |
| Balance Inquiry | 0.25 | nil |
| Online transaction History | FREE | FREE |
| e-wallet access | FREE | FREE |
| 1-800 customer service (24/7) | FREE | FREE |
| WEB Inquiries | FREE | FREE |
| Card to Card transfer (optional) | included | included |

**Schedule "C"**

**ABL Balance Report:** provide Buffalo Sabres ABL balances for Blue and White cards on a weekly basis and especially before and after game nights.

**Spend Report**: provide Buffalo Sabres a spend report after each game indicating location and spend amount for each location.

**White Card Report:** provide Buffalo Sabres a monthly report indicating the number of cards purchased during the month.

# EXHIBIT B



Prepaid Card Agreement 2015

THIS AGREEMENT made as of and effective from the ___4th___ day of ___June___, 2015 between:

BUFFALO BILLS, LLC, a company, located at 1 Bills Drive, in the Town of Orchard Park, New York, 14127 (hereinafter referred to as "BUFFALO BILLS FOOTBALL CLUB"), of the first part;
–and–
DCR STRATEGIES INC., a corporation located at 2680 Skymark Ave Unit 420 in the City of Mississauga, ON, L4W 5L6 (hereinafter referred to as "DCR") of the second part;

WHEREAS:

1) BUFFALO BILLS FOOTBALL CLUB operates a professional football team in Orchard Park, NY and desires to offer a pre-paid card, with limited and specific applications, to it's season ticketholders and others,

2) DCR promotes and operates a customized prepaid card program under the service mark "TruCa$h" which enables cardholders (hereinafter defined) to access funds in order to purchase products and services pursuant to company provided benefit programs (the "Program"),

3) BUFFALO BILLS FOOTBALL CLUB and DCR have agreed to facilitate the participation of Program Members (hereinafter defined) in the Program, and

4) Both BUFFALO BILLS FOOTBALL CLUB AND DCR acknowledge that the Program is NOT a credit, charge or travel/entertainment card

NOW WITNESS that in consideration of the mutual covenants and agreements hereinafter expressed, and other good and valuable consideration, receipt and sufficiency whereof is acknowledged by each of the parties, the parties agree as follows:

1 – INTERPRETATION

1.1 Definitions
Where used in this Agreement the following words and phrases shall have the meanings set forth below unless the context otherwise requires:

(a) "Agreement" means this Agreement and any instrument amending this Agreement and the schedules attached hereto as may be amended from time to time through mutual written agreement of the parties;

(b) "Cardholder" means an individual who is issued a TruCa$h Card (hereinafter defined) in order to participate in the Program by virtue of his or her enrollment in the Program.

(c) "E-Wallet Functionality" means a feature of the TruCa$h Card that allows a Cardholder to access account balances and transaction history via the internet;

(d) "Issuer" means the Customers Bank located at 99 Bridge Street, Phoenixville, Pennsylvania 19460 Member FDIC as the Financial Services Network member and issuing financial institution

(e) "Bills Bucks card" means a TruCa$h card that is sold by the BUFFALO BILLS FOOTBALL CLUB to any 3rd party and is initially loaded with his/her own cash or credit/debit card. Card is also reloadable by cardholder with his/her own cash or credit/debit card.

(f) "Bills Bucks Season Member card" means a TruCa$h card, provided to Buffalo Bills Season ticketholder free of charge, which is initially loaded with money provided by the BUFFALO BILLS FOOTBALL CLUB and is reloadable by cardholder with his/her own cash or credit/debit card.

(g) "TruCa$h Card" means a prepaid Bills Bucks Season Member card or Bills Bucks card which enables Cardholders to carry out certain business purchases at Ralph Wilson Stadium and other limited locations, all of which are to be selected by the

BUFFALO BILLS FOOTBALL CLUB;

(h) "Trust Account" means an account administered by the Issuer into which funds are deposited by BUFFALO BILLS FOOTBALL CLUB and/or Program Members, and from which payments are distributed to certain business retailers or entities and the parties to this Agreement, as the case may be, pursuant to the terms and conditions of this Agreement

(i) "Program Member" means a cardholder who receives a TruCa$h Card from the BUFFALO BILLS FOOTBALL CLUB and is, consequently, participating in the Program.

## 2 - COVENANTS OF BUFFALO BILLS FOOTBALL CLUB

BUFFALO BILLS FOOTBALL CLUB agrees as follows:

2.1 To purchase prepaid TruCa$h Cards for distribution to Cardholders in accordance with the prices and terms set forth in Schedule "A" attached hereto. Project timeline will be determined and accepted by both parties

2.2 Subject to applicable privacy laws, rules and regulations and the privacy policy of the BUFFALO BILLS FOOTBALL CLUB, to provide personal information ("Cardholder Information") relating to Cardholders in accordance with a form and manner provided by DCR, in an electronic format acceptable to DCR within reason. Such information will include First Name, Last Name and Address and will enable the reloading of the card associated with the member. D.O.B of member shall be required at the time when additional funds are added by the cardholder.

   a) As part of the Cardholder Information, BUFFALO BILLS FOOTBALL CLUB agree to provide (i) the date that a Cardholder is authorized to utilize their TruCa$h card and; (ii) the total amount that the Cardholder is authorized to spend.

2.3 Ensure sufficient funds are maintained in the Trust Account to cover the use of the TruCa$h card by Program Members. For each football season (August – January, or through end of playoffs), BUFFALO BILLS FOOTBALL CLUB agrees to maintain a deposit of $325,000.00 within the Trust Account for the Bills Bucks Card and Bills Bucks Season Member Card. Within three (3) days of any home football game at Ralph Wilson Stadium, –BUFFALO BILLS FOOTBALL CLUB –agrees to replenish the Trust Account by the immediate wiring of monies into the Trust Account. Both parties agree to monitor the activity of the Trust Account on at least a weekly basis.

   a)      BUFFALO BILLS FOOTBALL CLUB will have the option, to separate the Accounts used for Bills Bucks Season ticketholders and the Bills Bucks cards, thereby utilizing two (2) separate accounts. The deposit schedule for the Bills Bucks Season ticketholder Account would not change from above, whereas the deposit that would be required to be maintained for the Member Club Account, is to be mutually agreed upon, but in no event would be greater than $50,000.

## 3 - COVENANTS OF DCR STRATEGIES INC.

DCR agrees as follows:

3.1 To administer the Program, including, without limitation, the recording and completion of all transactions between Cardholders and merchants with which Cardholders transact pursuant to their participation in the Program.

3.2 To provide, at DCR's sole cost and expense, reports on a monthly basis, and as otherwise may be reasonably requested by BUFFALO BILLS FOOTBALL CLUB, in a form and manner predetermined and agreed upon and as specified by BUFFALO BILLS FOOTBALL CLUB, acting reasonably, for the purposes of fulfilling its obligations hereunder, and at all times subject to the provisions of 8.4 herein

3.3 To hold all funds transferred by BUFFALO BILLS FOOTBALL CLUB to the Trust Account in trust for the benefit of BUFFALO BILLS FOOTBALL CLUB, to be applied as provided herein, until such time as the funds have been transferred to Cardholders accounts pursuant to the

terms and conditions of this Agreement. For greater clarity, it is acknowledged by DCR that all funds deposited by BUFFALO BILLS FOOTBALL CLUB shall remain the property of BUFFALO BILLS FOOTBALL CLUB until such times as those funds are loaded onto cardholder's cards, or returned to BUFFALO BILLS FOOTBALL CLUB and/or Program Member, as directed by the BUFFALO BILLS FOOTBALL CLUB.

3.4   To provide the framework/authorization that will allow the transfer of monies, previously provided by BUFFALO BILLS FOOTBALL CLUB to Issuer pursuant to 2.3 herein, between appropriate accounts within the Issuer in order to allow the loading of monies onto TruCa$h Cards which in turn allow the Cardholder to utilize their TruCa$h Cards.

3.5   To support E-Wallet Functionality to enable Cardholders to access their unique card accounts, and monitor their TruCa$h debit card Point of Sale detail and history.

3.6   To provide Cardholders with TruCa$h Card functionality that permits Cardholders to access any and all of the funds that the Buffalo Bills (or Cardholder) have authorized be available on the TruCa$h Card for Point-of-Sale systems' purchases while at Ralph Wilson Stadium (or other authorized locations). Fees and the cost of any other services that may be provided to Cardholders from time to time in connection with their participation with the Program will be charged to the Cardholder at posted rates in effect under the terms of this Agreement at the time of the transaction.

3.7   To provide a call center and a toll-free number with service coverage available to Cardholders twenty four (24) hours a day seven (7) days a week. For the first several games of the preseason and regular season, DCR will have additional representatives available to discuss and remedy an issues or glitches that will arise with the Program.

3.8   Not to use any Cardholder Information and data provided by BUFFALO BILLS FOOTBALL CLUB other than to promote Buffalo Bills Program and that any advertising/promotion will be submitted to the BUFFALO BILLS FOOTBALL CLUB for review and written approval.

3.9   To ensure that the Issuer or any other parties with which DCR transacts business in order to carryout their duties under this Agreement, comply with all appropriate laws, rules and regulations applicable to that party's activities imposed by the applicable jurisdictions and regulatory bodies, as the case may be.

3.10  Consumers Bank is FDIC insured and that the monies that are to be placed into the bank are fully insured, without limit. DCR to provide BUFFALO BILLS FOOTBALL CLUB satisfactory documentation, in the form of a letter agreement, that CFSB will regulate distribution of monies within the Trust Account in accordance with the Terms of this Agreement.

3.11  To provide software that will enable Cardholder to perform all the functions under this Agreement that is secure and will protect the cardholders' information from theft.

3.12  To provide a dedicated IT specialist and a program manager to be responsible for management of the BUFFALO BILLS FOOTBALL CLUB program.

4 – CHARGES

4.1   BUFFALO BILLS FOOTBALL CLUB shall pay to DCR the amounts on the dates indicated in Schedule "A" attached hereto for the initial supply of TruCa$h Cards, plus applicable taxes, shipping and handling costs.

4.2   The Cardholder shall be charged the fees indicated in Schedule "B" attached hereto for the usages indicated thereon. Unless otherwise noted, the charged fees shall be automatically deducted from the Cardholder's account.

4

5–INTELLECTUAL PROPERTY

5.1 DCR hereby grants to BUFFALO BILLS FOOTBALL CLUB a non-exclusive, revocable license to use the "TruCa$h" service mark and "TruCa$h" logos and otherwise make use of DCR's intellectual property and proprietary information solely for the purposes of carrying out BUFFALO BILLS FOOTBALL CLUB's obligations hereunder and according to the terms and conditions contained herein.

5.2 BUFFALO BILLS FOOTBALL CLUB hereby grants to DCR the non-exclusive, revocable and limited license to use the BUFFALO BILLS FOOTBALL CLUB Marks (as provided for by the BUFFALO BILLS FOOTBALL CLUB) (hereinafter the "Marks") solely in connection with carrying out DCR's obligations hereunder and according to the terms and conditions contained herein, subject in each instance to the prior written approval of BUFFALO BILLS FOOTBALL CLUB. Each and every proposed usage of the Marks (including all text and contextual material) hereunder must be approved in advance, in writing, by BUFFALO BILLS FOOTBALL CLUB, and DCR hereby agrees to provide BUFFALO BILLS FOOTBALL CLUB with copies of all proposed usages sufficiently in advance so that BUFFALO BILLS FOOTBALL CLUB may exercise its approval rights hereunder. Once approved, any departure from such approved use will require the prior written approval of BUFFALO BILLS FOOTBALL CLUB. This license is subject and subordinate to the constitution, by-laws, resolutions, rules and agreements of the NFL.

5.3 The term of this license shall be coterminous with the term of this Agreement. This license is limited to DCR's use of the Marks as permitted herein, and without limiting the foregoing, does not grant the right to use any other trademark or indicia of the NFL or its member clubs, or the names, likeness, reputations, good will or any other aspect of the right to privacy, personality or publicity of any individual or group, including any individual or group of present or former NFL players.

5.4 DCR agrees that it shall not at any time file an application for trademark registration or otherwise attempt to obtain ownership of any name, design, logo or trademark or trade name which includes or is confusingly similar to the Marks or which makes reference to the Marks nor otherwise take any action that will directly or indirectly challenge or contest the ownership of, or adversely affect, the Marks or BUFFALO BILLS FOOTBALL CLUB's rights therein. DCR agrees that any and all uses of the Marks by it shall inure to the benefit of BUFFALO BILLS FOOTBALL CLUB.

5.5 In the event of a termination of this license, DCR agrees to refrain from any further use of the Marks. DCR agrees that the Marks possess a special, unique and extraordinary character which makes difficult the assessment of monetary damages sustained by unauthorized use. DCR recognizes that irreparable injury would be caused by unauthorized use and agrees that injunctive and other equitable relief would be appropriate in the event of a breach of this license, provided that such remedy shall not be exclusive of other legal remedies otherwise available to BUFFALO BILLS FOOTBALL CLUB.

5.6 The parties acknowledge and agree that all intellectual property belonging to DCR, including, but not limited to, logos and trademarks, data and software code or systems shall remain the exclusive property of DCR, and may not be used by BUFFALO BILLS FOOTBALL CLUB without the expressed written consent of DCR if such use is not in furtherance of this Agreement as contemplated in section 5.1 above.

6 - INDEMNITIES

6.1 DCR hereby agrees to defend, indemnify and saves harmless BUFFALO BILLS FOOTBALL CLUB, its affiliates, officers, directors, employees and agents from all claims, costs, damages and liability, including attorney fees, arising in any way out of (i) the operation of the Program by DCR or (ii) the work of any third party, including but not limited to the Issuer, i.e. CFSB, network, i.e. Discover, processor, i.e. FIS, who performs a function to help satisfy DCR obligations under the terms of this Agreement, (iii) negligence by DCR, (iv) the improper use of the

5

intellectual property of BUFFALO BILLS FOOTBALL CLUB by DCR; (v) the breach of this Agreement, including but not limited to, the representations and warranties set forth herein by DCR; (vi) any claim by a third party that the Program or the products or services of DCR infringes on or otherwise unlawfully harms any intellectual or other property rights of any third party; or (vi) DCR's failure to comply with any applicable laws.

6.2   BUFFALO BILLS FOOTBALL CLUB hereby indemnifies and saves harmless DCR, its affiliates, officers, directors, employees and agents from all claims, costs, damages, and liability arising from the negligence of the BUFFALO BILLS FOOTBALL CLUB, the improper use of the TruCa$h logos and trademarks and intellectual property of DCR by BUFFALO BILLS FOOTBALL CLUB or the breach of this Agreement by BUFFALO BILLS FOOTBALL CLUB.

6.3   BUFFALO BILLS FOOTBALL CLUB hereby indemnifies and saves harmless DCR for any loss, damage or injury arising in connection with a claim associated with the loss, theft or fraudulent use of any TruCa$h Card purchased by BUFFALO BILLS FOOTBALL CLUB pursuant to this Agreement, and any liability arising in any way out of such losses, save and except in the event any such losses are as a result of the negligence, willful misconduct or breach of DCR's covenants, representations or warranties under this Agreement by DCR or those for whom it is at law responsible, or if such losses were due to the acts or omissions of a third party, including but not limited to the Issuer, i.e. CFSB, network, i.e. Discover, processor, i.e. FIS, who is to perform a function in order to satisfy DCR obligations under the terms of this Agreement.

6.4   Unless otherwise directed by the BUFFALO BILLS FOOTBALL CLUB, DCR hereby acknowledges and agrees that all fees associated with the stored value or functions of the TruCa$h as set forth in Schedule "B" attached hereto shall be the sole responsibility of Cardholders and DCR hereby indemnifies and releases/saves harmless BUFFALO BILLS FOOTBALL CLUB from and against any non-payment of such fees by Cardholders.

## 7 – CONFIDENTIAL INFORMATION

7.1   In connection with the business relationship contemplated by this Agreement, a party, its employees, officers, agents and/or advisors may receive ("Receiving Party") or have access to commercially valuable proprietary information of the other party ("Disclosing Party"), including information, regardless of form, relating to the business of the Disclosing Party that is not generally available to others, including without limitation and by way of example only, trade secrets, know-how, customer lists, marketing and business plans ("Confidential Information"). The Receiving Party acknowledges and agrees that any Confidential Information received or otherwise obtained from the Disclosing Party shall remain the sole and exclusive property of the Disclosing Party and may not be used, disseminated or disclosed to the extent reasonably commercially possible (both during the Term of this Agreement and subsequent to the termination thereof) and shall be held by the Receiving Party in confidence except as may be necessary to perform the obligations required under this Agreement or as may be required by law. Confidential Information does not include information that: (i) at the time of disclosure to the Receiving Party is in the public domain;
(ii) after disclosure to the Receiving Party becomes generally available to third parties by publication or otherwise through no breach of this Agreement by the Receiving Party; (iii) was lawfully in the possession of the Receiving Party prior to disclosure, as evidence by the written records of the Receiving Party and which was not acquired, directly or indirectly, from the Disclosing Party in connection with this Agreement; or (iv) becomes available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party if such source was not, to the knowledge of the Receiving Party, subject to any prohibition against transmitting the information to the Receiving Party and was not bound by a confidentiality agreement with the Disclosing Party.

7.2   Notwithstanding anything to the contrary contained herein, DCR acknowledges and agrees that it shall not allow any other DCR partner or other third party to have access to any information with respect to BUFFALO BILLS FOOTBALL CLUB or BUFFALO BILLS FOOTBALL CLUB's customers or members. DCR will keep BUFFALO BILLS FOOTBALL CLUB's database information in strict confidence.

7.3 Nothing herein shall restrict BUFFALO BILLS FOOTBALL CLUB's use of any information contained in BUFFALO BILLS FOOTBALL CLUB's records regarding BUFFALO BILLS FOOTBALL CLUB's customers or their transactions with BUFFALO BILLS FOOTBALL CLUB.

## 8 – REPRESENTATIONS & WARRANTIES

Each party hereby represents and warrants to the other that:

8.1   It fully has the right, power and authority to enter into this Agreement and perform any acts as required under this Agreement and the performance of this Agreement by the party does not and will not breach any agreement entered into by the party or that otherwise binds such party.

8.2   It is the exclusive owner or authorized licensee of all rights, intellectual property, materials, software, technical know-how and information supplied, licensed or used by in connection with this Agreement.

8.3   It shall comply with all laws, rules and regulations applicable to that party's activities imposed by the applicable jurisdictions and regulatory bodies, as the case may be.

DCR hereby further represents and warrant to the BUFFALO BILLS FOOTBALL CLUB that:

8.4   It shall maintain, use and disclose all personal information collected or otherwise obtained from Cardholders or any other individuals pursuant to performing its obligations under this Agreement ("Carholder Data") in a manner that conforms with the requirements under the *Personal Information Protection and Electronic Documents Act* (Canada), the Safe Harbor-certification according to the US Department of Commerce, and pursuant to the policy agreement between the US Department of Commerce and the European Commission regulating the protection of personal data and any and all other applicable privacy laws (including United States privacy laws).

8.5   It shall at all times ensure that any services carried out by any third party (card issuer, ie. Consumers Bank – any processors, i.e. FIS or network, i.e. MC) in connection with a party's activities pursuant to this Agreement are carried out in accordance with the law, are of first class quality and of a substantially similar standard as can reasonably be expected from such services of a comparable class in the industry to which they belong. Notwithstanding the foregoing, no Confidential Information shall be provided to any third party unless the Receiving Party has informed the third party that the information is confidential and ensures that the recipient complies with Section 7.1 of this Agreement as if the recipient was also bound by it.

It shall implement, maintain, and fully adhere to a written information security program that incorporates administrative, technical, and physical safeguards designed to ensure the security, confidentiality, and integrity of Cardholder Data. At a minimum, DCR shall provide safeguards for Cardholder Data that meet or exceed any requirement under applicable law and that protect the information against reasonably anticipated threats or hazards, including from unauthorized access, destruction, use, modification, or disclosure. Without limiting the foregoing, DCR shall also ensure that its performance hereunder (including the performance of its subcontractor(s)) complies with the AICPA's Statement on Standards for Attestation Engagements No. 16 ("SSAE No. 16") and that DCR receives an annual "SOC2" audit of the data center's compliance with SSAE No. 16 conducted by an independent third party (and, in the event of any unsatisfactory audit findings, the relevant audit reports, including any assessment or evaluation of the effectiveness of the controls, will be provided promptly to Client).

It shall, within one day of discovery, report to BUFFALO BILLS FOOTBALL CLUB any (i) loss or misuse (by any means) of Cardholder Data; (ii) inadvertent, unauthorized, and/or unlawful processing, disclosure, access, alteration, corruption, transfer, sale, rental, destruction, or use of Cardholder Data; or (iii) other act or omission that compromises or may compromise the security, confidentiality, or integrity of Cardholder Data (each of the forgoing events a "Security Breach"). DCR shall use best efforts to immediately remedy any Security Breach and prevent any further Security Breach at DCR's expense in accordance with applicable privacy rights, laws, regulations and standards.

## 9 - TERM AND TERMINATION

9.1 This Agreement shall be effective on and from the date of execution hereof (the "Effective Date") and shall continue for a term of two (2) years (the "Term"), unless earlier terminated pursuant to the terms hereunder.

9.2 This Agreement may be terminated by BUFFALO BILLS FOOTBALL CLUB, without cause or reason and without liability to the BUFFALO BILLS FOOTBALL CLUB, upon ninety (90) days prior written notice of BUFFALO BILLS FOOTBALL CLUB's intention to terminate.

9.3 Unless the BUFFALO BILLS FOOTBALL CLUB provides written notice that they wish to exercise the option to renew this Agreement for another 1 year period, at least 90 days from the end of the 2 year term (as noted above), this Agreement will expire at the end of the 2 year term. Such right to renew, by the BUFFALO BILLS FOOTBALL CLUB, will continue on an annual basis and under the same terms each year thereafter.

9.4 Upon the occurrence of any of the following, either party shall have the right to terminate this Agreement immediately upon notice to the other:

If either makes an assignment for the benefit of creditors, institutes or has instituted against it proceedings under any statute relating to insolvency or bankruptcy, or if receiver or manager or person with like powers is appointed to take charge of its assets or undertaking;

a) If an order is made or resolution passed for the winding up or liquidation of either party; or

b) The entry by either party into an agreement for the sale in bulk of its assets or if there is a change in the effective voting control of either party.

8

9.5   Upon the occurrence of any of the following, the non-defaulting party shall have the right to terminate this Agreement after notice in writing to the other of the particulars of such default if the other has not remedied such default during the specified notice period:

    a)   The failure to report in accordance with the terms of this Agreement and such default continues for seven (7) days after written notice has been given;

    b)   The failure to pay any sums due within the time required under this Agreement, and such default continues for ten (10) business days after written notice has been given;

    c)   The failure to materially perform any of the other terms or conditions of this Agreement, including the failure of DCR systems and/or programs to work and where such default continues for thirty (30)* days after written notice has been given.

       * For clarity and to ensure that all parties are on the same page, given that this program is going to be implemented during the National Football League season of the Buffalo Bills and that throughout the season there are multiple games within a thirty (30) day time period, the parties recognize that the Program must function at a high level for each and every home game throughout the NFL season. Thus, it is agreed that if the Program significantly malfunctions for one Buffalo Bills game, whether through fault of DCR or others (except the BUFFALO BILLS FOOTBALL CLUB in which case this provision will not apply), and DCR is not able to rectify the problem causing the malfunction prior to the next Buffalo Bills home game, to the satisfaction of the BUFFALO BILLS FOOTBALL CLUB, the BUFFALO BILLS FOOTBALL CLUB will be allowed to terminate this Agreement immediately (without waiting a 30 day time period) upon written notice to DCR.

9.6   Upon termination by any party pursuant to any clause hereunder, the parties shall immediately stop operating the Program pursuant to this Agreement and shall forthwith cease all advertising and any use being made of the intellectual property of the other. Original versions of any and all Confidential Information, intellectual property or any other proprietary information or material shall be returned to the party to whom it belongs at the request of such party, within five (5) days of such request. Any copies of such information or other materials shall be destroyed or kept strictly confidential.

9.7   Pursuant to Paragraph 3.3 herein, any monies remaining in the Trust Account at termination of the Agreement is property of the BUFFALO BILLS FOOTBALL CLUB and/or Program Member and DCR agrees to provide any and all releases/documentation necessary to enable BUFFALO BILLS FOOTBALL CLUB or Program Members to remove said property from the Trust Account.

## 10 - GENERAL CONTRACTUAL PROVISIONS

10.1   The parties expressly agree that nothing in this Agreement shall constitute any party as the agent, partner, or joint venture of the other and nothing in this Agreement shall grant any party the right to make representations or enter into any agreements on behalf of any other party. All parties agree to perform their covenants hereunder in a professional and ethical manner.

10.2   The parties agree that the laws of the State of New York shall govern this Agreement and that DCR agrees to Erie County as the jurisdiction for resolution of any legal proceedings

10.3   Should any dispute arise between the parties to this agreement that cannot be remedied satisfactorily by negotiation, the parties agree to submit the matter to arbitration to be

governed in accordance with the American Arbitration Act and shall be binding. While DCR employs procedures to identify fraudulent transactions, subject at all times to section6.3 hereof ,DCR assumes no responsibility or liability for failure to discover any fraud, theft or other dishonesty committed by any person not employed by DCR except as provided for here in.

10.4 All notices, requests, demands or other communications required or permitted to be given by one party to any other party shall be given in writing by personal delivery, overnight courier or by facsimile transmission to such other party at the address stated below. All notices shall be deemed to have been received when delivered or transmitted,:

> TO:   BUFFALO BILLS, LLC
>        1 Bills Drive
>        Orchard Park, NY 14127
>        Fax 716-855-4704

> TO:   DCR STRATEGIES INC.
>        2680 Skymark Ave Suite 420
>        Mississauga, Ontario
>        L4W 5L6
>        Fax 905-212-9678

10.5 This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors.

10.6 The parties agree that this Agreement may not be amended without the express written consent of all of the parties to this Agreement.

10.7 All amounts indicated in this Agreement or any Schedule hereto shall be in U.S. Dollars.

10.8 Neither party may assign, delegate or otherwise transfer its rights or obligations under this Agreement, without the prior written consent of the other party; provided, however, that this Agreement and the rights thereunder may be assigned without such prior consent by BUFFALO BILLS FOOTBALL CLUB, to a corporate affiliate which shall assume all of its obligations hereunder or to any entity which purchases all or substantially all of the assets (or otherwise succeeds to the business) of BUFFALO BILLS FOOTBALL CLUB.

10.9 This Agreement is subject and subordinate in all respects to (a) all relevant present and future Federal, state and municipal laws, regulations, rules, orders, consent decrees and decisions, (b) the NFL constitution, NFL by-laws, and all rules, policies, board resolutions, decrees, regulations and agreements of the NFL (including, without limit, any national corporate marketing, licensing, sponsorship or similar agreements between the NFL (or an NFL affiliate) and third parties), all as the same may now exist or hereafter be amended or enacted or as they may be interpreted by the Commissioner ("NFL Rules and Agreements") and (c) the present and future constitution, by-laws, rules, regulations and agreements any other leagues having jurisdiction over the advertising and matters set forth herein. Without limiting the foregoing, if the benefits granted to DCR hereunder include advertising, then: (i) such advertising is subject to pre-emption in the event of a major television network contract to which the National Football League is a party or of an international event; and (ii) in the event that the Term exceeds one (1) year, this Agreement, notwithstanding anything to the contrary set forth herein, may be terminated at the end of any National Football League season by unilateral action of BUFFALO BILLS FOOTBALL CLUB or the National Football League.

10.10 This Agreement may be executed in one or more counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same agreement. This Agreement may be executed by facsimile.

10.11 DCR, its subsidiaries and/or affiliates agrees to provide ten (10) percent of any net profits that are realized by DCR, its subsidiaries and/or affiliates, to the BUFFALO BILLS FOOTBALL CLUB, if a similar card program, is accepted and subsequently utilized by any other sports team throughout North America. DCR agrees to update and where applicable, pay, the BUFFALO BILLS FOOTBALL CLUB on an annual basis on this issue.

10.12 Parties agree that the terms of this Agreement will be confidential and will not be disclosed to any third party, unless required by law, without the prior written approval of the other

party.

10.13   If any one or more of the provisions of this Agreement or the application of any such provision to a specific situation will be held invalid or unenforceable, such provision will be modified to the minimum extent necessary to make it or its application valid, and the enforceability of all other provision of this Agreement and all other applications of such provision will not be affected thereby.

10.14   Unless specifically agreed to the contrary in writing, (i) the failure by either party at any time to require performance by the other of any provision of this Agreement will not affect such party's right thereafter to enforce such provision; (ii) no waiver by either party of any subsequent default; and (iii) no extension of time granted by either party for the performance of any obligation of the other will be deemed to be an extension of the time for performance of any other obligation hereunder.

10.15   A depiction of the Program and how it will function, as outlined herein, are set forth in Exhibit "A" attached hereto.

IN WITNESS WHEREOF this Agreement has been executed by the parties as of the date first written above.

BUFFALO BILLS, LLC                                       DCR STRATEGIES INC.

Per: _____                             Per: _____
    *I have the authority to bind the*                       *I have the authority to bind the*
    *Company*                                                *Corporation*

Name: _Chris Colleary_____ Title: __              Name: _H. MASSE  , CEO__ Title: _
     Executive Director of Ticket
              Sales + Service

SCHEDULE
"A"

Locatio
ns
Location Information to be provided by BUFFALO BILLS FOOTBALL CLUB and shall include operating name of location, contact person at the location, full address, telephone number and any other information required to run the Program.

Initial Supply of Cards

BUFFALO BILLS FOOTBALL CLUB shall purchase the following:
   a)  20,000 cards for Season Ticket Holders at a price of $3.45 per card per member per year with an expiration date of two(2) years
   b)  5,000 Member Club Card at a price of $3.45  per card with an expiration date of two (2) year.

Card costs are payable as follows:
Upon receipt of invoices

*Above card prices are exclusive of shipping and handling charges and applicable taxes.*

Price of card will include the following:
   -   design and printing of a customized four-color card. Front of the card will include customization for BUFFALO BILLS FOOTBALL CLUB and back of the card will be printed as per DCR specification

   -   all loads onto cards
   -   all POS transactions
   -   design and printing of a customized carrier

11

- affixing card sticker to card
- encoding, embossing or thermal imaging

BUFFALO BILLS FOOTBALL CLUB
Schedule "B"
Processing Service
Fees

| Fee Description | DCR Fees to Buffalo Bills | Buffalo Bills Fees to Cardholder |
| --- | --- | --- |
| Load Fee | included | nil |
| POS usage | included | nil |
| Additional Cardholder Services are Optional | | |
| POS declined transaction fee | included | included |
| Replacement Card | TBA | TBA |
| Balance Inquiry via telephone call only | 0.25 | nil |
| Online transaction History | FREE | FREE |
| e-wallet access | FREE | FREE |
| 1-800 customer service (24/7) | FREE | FREE |
| WEB Inquiries | FREE | FREE |
| Card to Card transfer (optional) | 1.00 | included |

Schedule "C"

ABL Balance Report: provide Buffalo Bills ABL balances for STH and Gift cards on a weekly basis and especially before and after game nights.

Spend Report: provide Buffalo Bills a spend report after each game indicating location and spend amount for each location.

Member Club Card Report: provide Buffalo Bills a monthly report indicating the number of cards purchased during the month.